and the Attorney General of the United States, Mr. Simpson. Good morning, Your Honor. Good morning. May it please the Court, Andrew Simpson on behalf of Eva Salav. I would like to reserve four minutes for a rebuttal. That request will be granted. Your Honors, this is an appeal from a summary judgment in which factual questions abounded. If we were appealing from a final jury verdict where there was contested evidence, we wouldn't be here because the facts were resolved against us. But that can't happen on summary judgment. I think the best evidence of the number of questions of fact comes when you compare the evaluations of Ms. Salav by her direct supervisor, Hawk, with the denial of extension memo that he writes two months after her last evaluation and six weeks, I think, after the SAP evaluation. Two months earlier, she's a good employee who gets along with everyone in the office, and then you come to the denial of extension memo and she doesn't get along with people. And we, of course, say that the denial of extension memo is a pretext, that the explanations given there are a pretext, and that there's a jury question because in Hawk's own words, which he affirmed in his deposition, the evaluations he gave of Ms. Sala were accurate. There's a direct conflict right there. Let me direct you to one of the first points in the discrimination claim, not the hostile work environment claim. How do you establish and how has your client established the adverse employment action? Yes, Your Honor. She was transferred, and this court has said that in some circumstances, the transfer, even without a change in grade or reduction in pay, can be an adverse employment action. In this case, she was moved 1,500 miles against her will. But she knew that was going to happen. She knew when she came here that she was either going to be here for three years or if custom prevailed, she'd be here for four years and then she was going to go somewhere else. Or she could extend for yet another year and be here for five years. She knew that eventually she would be moved again, or she could be moved again, but she also could remain, she just would not get additional benefits. It is unlikely that the DEA would have moved anyone who wanted to stay in either the Virgin Islands or Puerto Rico because they're paying thousands of dollars in benefits to get employees to come here, even though they have a mobility agreement that allows them to require them to come here. It is actually unlikely that she would have been transferred at the end of a three or four or five year period. It's just that she would have stayed without getting additional benefits. I'm sorry. I heard you. I just don't understand how that's an adverse employment action, particularly as the case law describes that term. I mean, if she knew that at point A, B, or C, year three, four, or five, she could be transferred, the whole ethos of the DEA is you're going to be transferred. How is a transfer to Florida an adverse employment action? Well, I would take issue with the idea that the whole ethos of the DEA is that you're going to be transferred because I think she would not have been transferred if she wanted to stay, another employee would not have been transferred if he wanted to stay even beyond the five years because they have trouble filling this position. But, be that as it may, in addition to the moving 1,500 miles, her pay is reduced $7,000. But that is for cost of living, isn't it? It is an incentive cost of living that the DEA says is an incentive to get you to move to St. Croix. But when they want to transfer you back, well, this isn't an incentive, this isn't a change in your, this isn't adverse. It was an incentive to get you here, but it's not adverse to take it away when you moved. That doesn't make sense. So it is an incentive to get you here. Pardon me? It absolutely is called a cost of living. Yes, Your Honor, it is. Well, first of all, there's no showing that there's an equivalency. The cost of living adjustment when she first came down was 20%. It was raised to 25%. It's tax-free. She testified in her declaration that there was a difference in her take, I believe it was in her declaration, where she said, there's a difference in what I take home at the end of the day after I pay for all my groceries and everything else in Orlando than there is in St. Croix. There's also the 20 days home leave she leaves. So there's a totality of things here that she has lost as a result of the transfer. And the memo that the DEA promulgated in 1997 that describes the incentives talks about the employee who decides to stay, to extend from three years to four years. It doesn't say if the DEA has a right to overturn that, but it talks about the employee deciding to stay for an additional year. And again, in the context of we're trying to get employees to come here because we can't get anyone to come here. In that context, if she stays for an extra year, she gets 20 days home leave, which involves 20 days with pay on vacation, round trip airfare to her home location as maintained by DEA files. And that's a substantial benefit. The government argues though that the net, when you look at everything at WSDOT, they bought her house back, or they bought her house upon her transfer. She apparently either made money through that purchase or avoided losing money by having them purchase it. I'm not sure what. But they say it's a net wash. It's a net wash on her house, but that doesn't make it a net wash overall. And there's no evidence from which that's the extent to which there's a net wash. Yes, Your Honor. And that's a benefit that's given to every DEA agent. That is not just strictly for someone coming to St. Croix, St. Thomas, or Puerto Rico. If you're moved from D.C. to Philly, they buy your house. There's a set process for doing it. There's a market study done and appraisal done. And if you're unable to sell it, then they step in and buy it. And she was unable to sell her house, and so they stepped in to buy it. On the adverse employment action, she's moved 1,500 miles. She's lost 20 days home leave, which is 20 days with pay off round-trip airfare and $7,000 in pay. I submit to you that we have cited cases in my brief where a few hundred dollars is sufficient to constitute an adverse employment action. The court found that the denial was discretionary and that therefore there couldn't be discrimination. I think we've adequately addressed that issue in our brief, that whether a benefit is discretionary or not, you can't deny it for a discriminatory reason. One of the issues I take issue with on the court's decision was the fact that it only looked at some of the pretextual reasons given by Hawk for denying the extension. The judge talks about there being six primary reasons articulated by Agent Hawk in the motion for summary judgment. But the denial memo cites 25 reasons, and you have to consider the totality of those reasons. They are inextricably intertwined. Hawk says 13 times in his EEOC affidavit that this was for all the reasons. They're all combined. I can't single one out. And both the second lines... No, Your Honor, you can't. A jury might be able to, but Agent Hawk swore in EEOC affidavits that he couldn't single them out. It was the totality. All of them put together. Thirteen times he said that. And then the first line supervisor, Shepherd, says the same thing. And the second line supervisor, Harris, says the same thing. So maybe a jury could say, well, this one is not intertwined, and therefore we find there wasn't a pretext. But the court can't do that on summary judgment. Since the case of Staub v. Proctor Hospital, whose decision do we review? Hawk's or Harris's? Well, I think you  know that Harris was the ultimate decision maker. But as we point out in our reply brief, because Staub had just come out at that time, Hawk was the cat's paw. And Harris acknowledges that. He says, Stala's name had not come across my desk before. So when I got this oral report saying Hawk does not want a concurrent or extension, I said, write me a memo. So Hawk writes the memo. And he says in his EEOC affidavit, I relied upon that memo. So he was the cat's paw. We're being worked by Hawk. So there's ample evidence of discriminatory conduct by Hawk. And because Harris has been manipulated in that process under Staub, we meet our burden. Yes, Your Honor. How do you fulfill severe and pervasive? Well, I think first of all we have to remember that it is severe or pervasive under the Supreme Court case in Pennsylvania State Police. They make it clear it is severe or pervasive. And this court has acknowledged that on the video. You, the aggressive woman, will like this video. And she reviews it. Before that, she has been coming into the office earlier. She and Hawk are always the first. If you're saying that they're separable, which are you arguing to us now? You said severe or pervasive. Are you arguing that it was severe or are you arguing that it was pervasive? I believe it was both. Right now I'm focusing on the severity of the one incident. And I will get to pervasive if I have time. Thank you, Your Honor. The one, the aggressive woman video is severe. She gets that video. Before that, she's been coming into the office early. She's a hard worker. She gets that video. And from that day on, she doesn't come in until around 8 o'clock when everyone else is in the office. Because she doesn't want to be alone in the office with Hawk. So her conditions of her employment have been altered by one incident. How is that a condition of employment being altered? I mean, if she's coming into the office when she's expected to come into the office? Well, Your Honor, when they talk about the conditions of employment in this context, they're talking about your work environment. It's the work environment has been changed. Her work environment before was she gets to work early. She's a go-getter. Hawk even points out or claims in his denial memo that she doesn't give an honest day's work for an honest day's pay. Well, he was getting that before he drove her out of the workplace or made her afraid to come into the office and be there alone with him. Is that the worst instance that you assert? That is the most severe incident, yes, Your Honor. But it's coupled with other pervasive conduct. And there we have, I think, the most pervasive because it's every day, is her inability to get a weapon out of the weapons vault. She's not given access to it. She's testified she's denied access to it. She's testified that Agent Hawk can go out on a raid or an event with his shotgun, but she can't bring her shotgun. She's shotgun qualified. She can't get hers. She's been denied that. And every day she's in the workplace. Her work environment is someone can come into a DEA office and shoot people. And you don't want to be in that situation. Or you may have to respond. You may be the only person in the office and you have to respond to something. You don't want to be stuck with only your service revolver if you've got stronger weapon power in the safe, but you can't get it out. And that's pervasive. And there is something in the record that shows that she is treated in that way and others are not? The record is that she is the only one who was consistently denied access to the weapons vault. Hawk said when he initially got there he didn't have the combination, but he was given it. He's the supervisor. And this comes up in the context of the reply memo, so it's not fully developed, but in Sayla's declaration she says, I was denied access to the weapons safe. And we didn't have the opportunity to tailor it in the light of the reply that was to come to say Hawk denied it to me and here's how many times I asked for it. But she also testifies. That's only when you're going out on a raid, right? No, she doesn't. Every other DEA, she's a special agent. Every other special agent has access to the safe. They've got the combination. She won't be given the combination. So she doesn't have access on any day. She has her service revolver, but the weapons safe is where you have your backup firepower. If you need your shotgun you've got to go to the weapons safe. She can't get her shotgun if you need a grade launcher. When are you going to need a shotgun other than a raid? I'm not a DEA agent so I couldn't speculate. I will say that they're law enforcement officers. They respond to any event in this jurisdiction until recently you may be aware. But federal law enforcement officers will typically respond to any event and at that time she would have. So if there was a bank robbery in progress she could have responded to it. The DEA office, I think it's undisclosed, but it's in the vicinity of this courthouse. If there's an incident at this courthouse she would respond. She'd be responding with her service weapon instead of with a grenade launcher or a shotgun or whatever else they have in there. Thank you. We'll have you back on rebuttal. Mr. Abraham. May it please the Court. Timothy Abraham on behalf of the Appellee, the Attorney General of the United States. The Court should affirm the trial court's ruling for three reasons. One, the lateral transfer was not a significant change in benefits. Secondly, Appellant Sala did not raise sufficient evidence to show pretext. Third, she did not raise a genuine issue of hostile work environment because she did not raise a genuine issue that she had a severe or pervasive work environment that altered the conditions of her employment. First talking about the transfer, remember, Your Honors, that it's the plaintiff's burden to establish their prima facie case. So they are required to put in evidence to show why this is a significant change in benefits. Undisputed that Appellant Sala was transferred with the same base pay. She was a GS-13 Step 5 and transferred with that same title and grade. You can see that at Joint Appendix 365 to 367. Her moving expenses were paid for and her home was purchased. It's true that all agents, when they transfer, that happens. But she received a $57,000 payment, which you can see at Joint Appendix 249. Her growth pay was reduced because of the difference in cost of living, but the plaintiffs at the trial level conceded that, quote, there was theoretically no economic effect to this. And that's at page 16 of their opposition to summary judgment. So before the trial judge, they were saying, well, theoretically there's no economic effect. How can that be a significant change in benefits? How could the trial judge have erred in finding that there's no adverse action? They didn't introduce any testimony, no testimony to say that this transfer was to a less desirable position or a dead-end job like the cases they cite. They acknowledge that she signed a mobility agreement when she started with the EA, where she understood that part of her job as a criminal investigator was that she could be transferred around. Now, they make some statements about the incentives that are offered. The cost of living adjustment, whatever you call it, it is there to account for the change in cost of living, the difference in cost of living between Orlando and St. Croix. It can be viewed as an incentive in one way because it's not taxed here in the Virgin Islands, and it's higher than other places. So it can be viewed as an incentive, but regardless of whether you call it an incentive or not, you have to look at what changed when she was transferred and is that significant. All right. What about her 15 or 20 days, 15 at the end of three years, 20 if she had been granted a fourth year? What about those 20 days of paid leave? Well, Judge Fischer, she acknowledged that the rules were you had to get the fourth year to get the 20 days. But you had the 15 days for the third? No. Okay. Yeah. Yeah. All right. You're right. Well, the memorandum said you don't get the right to the 20 days until you agree to the fourth year. But her argument is, look, everybody who's been here before me was a male. If they wanted to stay the fourth year, they stayed the fourth year. I make application to stay the fourth year. I'm a female. I'm not allowed to stay the fourth year. And it's an economic loss to me. What about that? It doesn't matter what happened in the past. Your Honor, I'd submit because it's the D.A.'s discretion whether to give any agent that fourth year. And we introduced evidence that the decision maker Harris. But we're at the adverse employment action. Okay. We're at that stage. And you want to eliminate that because you say, well, she's not entitled to the fourth year. She's not entitled to those paid days until she gets the fourth year. But it seems to me that that's certainly something of monetary value. Well, then, Your Honor, I would submit if you look at that, the 20 days of leave and the $7,000 together, that it's still not a significant change in benefits. And when you look at the totality of the circumstances, one of the cases from this court, Nelson v. Opscala, talks about looking at employment opportunities and were her employment opportunities affected. And in fact, she hasn't introduced any evidence that her chances for promotion or her employment opportunities within D.E.A. were affected. The first reason was she wasn't initiating any cases. He looked at what Hawk said and believed it. He knew this guy who he was supervising. He believed what he said about her. And third, that he thought she would thrive in a larger office. That he thought it would be better for her career. Now, if you look at the Harris . . . But all those are contrary to his prior evaluations of her. To Hawk's prior evaluations, they're not contrary, Your Honor, because the evaluations ratings were lower than the other agents. There were generous comments in the evaluations, and we concede that. But that does not require a trial in this case. Let me ask you a hypothetical. We opened Supervisor Hawk's drawer, and there is a letter in his handwriting saying, I want to get rid of Agent Sala because I just can't stand having women working in the office with me. Now, with that letter, if we find no adverse employment action, is there any case here? No, Your Honor, because they have to show a prima facie case. They have to satisfy that it's an adverse employment action before they can get to the next step. They are correct when they say that a discretionary decision is still protected. Wilkerson, the case Wilkerson v. New Media says a failure to rehire can be an adverse action, but it has to be significant. It has to be a significant action. So, the court has to answer that question first. On the flip side of this question, as it relates to this case, if we find there has been an adverse employment action, you're not disputing that she's established a prima facie case on the other questions of discrimination. You didn't dispute that in your brief, at least. That's correct, Your Honor. If you find for her on this, we go to pretext. Okay. Looking at the evaluations, it's important to look at the rating. Hawk explained this in his declaration at 530 in the joint appendix. There were four ratings you could get. Outstanding, significantly exceeds, acceptable, and unacceptable. If you had an unacceptable, it was required that they put you on a performance improvement plan. Harris talks about this. This would have been a time-intensive thing. He talks about this in his EEO affidavit. So, Harris, as the ultimate decision maker, is looking at this. Getting back to the ratings, she got an acceptable on her first rating. She had these generous, nice comments, but she had an acceptable, the lowest rating you could have without having to have a performance improvement plan. I would say this is a C or a D. You look at the evaluation as a whole. The next evaluation she had was a significantly exceed. Hawk says she improved. This is actually contrary to their argument on hostile work environment because the video was sent in June of 2005 and she improved under what Hawk says. In fact, at her deposition, she testified, my performance improved between the time of the video June 2005 to 2006. She thought she should have been an outstanding. I asked her, what would you have rated yourself? Outstanding in 2006. That doesn't show that the conditions of her employment were altered. In fact, this video, she didn't bring it up for two years to anybody. When did she bring it up? When she found out she wasn't getting her year extension. If we move on to the issue of pretext, they talk in the brief about the judge improperly weighing evidence. There's no evidence of that. There's no evidence that he judged credibility. The standard in Fuentes, let's take the most generous standard. The most generous standard is the footnote in Fuentes which says you can cast substantial doubt on a bag full of the legitimate reasons offered. She didn't do that. You have to impede the credibility. There is not a requirement as they suggest in the brief that the trial court did. They suggest that the trial court said, okay, you've got to disprove the 25 reasons that he stated, which each have independent significance. I would submit to Judge Fischer to answer to your prior question. You don't have to submit, you don't have to rebut the 25 reasons. You just have to cast substantial doubt on a fair number of them so that they could believe a reasonable jury would find for you, would disbelieve the reasons. They haven't done that. If we look at the Hawk's memo, may I step away from the podium? If we look at Hawk's memo, Joint Appendix 67, and we go through all these reasons, first let's start with Harris' reason. He said she didn't initiate cases. She admitted at deposition that she didn't initiate any cases and that two other mail agents in the office initiated four cases in the same time period. She also admitted that in 2006, he told her, Hawk told her she should try to initiate more cases. So she admits right there the basis, one of his legitimate reasons, one of Harris' legitimate reasons for not giving her this one year extension. In addition to that, they make an allegation that he shut down her opportunity to develop cases. He testified in his declaration that he actually gave that case to her that she's claiming was shut down. He reassigned it from someone else to her. So based on this record, she hasn't shown, admitting she didn't develop cases, she hasn't shown pretext. If we look at his memo, Joint Appendix 67, and we look at the reasons and we go through the reasons, in most of the cases, she actually admits the primary conduct of what was done wrong. And I think there's a case that's really instructive on this. It's not a published case from this court, but Judge Chigares' case, Hood, 2009, Westlaw 101-9993. This case is very instructive because it goes through this and says, you have to look at the employer's perception. Her excuses and her reasons, if we go through these reasons he cited in the memo, she admits most of these. Although she may shift blame onto someone else, she admits that they happened. She doesn't raise a doubt that these things didn't happen. She admits a prisoner was 45 minutes late for grand jury in a major case. That was the only case the office was handling at the time. She was the only person, her sole task was to go over there and make sure this person got there and assist the marshals. But she was on a personal errand in her personal rental car at the time the person was late. She admits that. She doesn't say she asked for leave from her employer during that time. She doesn't say she was off of work. The district court discussed six of the reasons mentioned in Hawk's memorandum to determine whether the reasons were legitimate or protection. Would you agree with that? I'm sorry, Your Honor. I didn't hear the last part of what you said, the six reasons. The district court discussed six of the reasons that Hawk had given. It didn't discuss all of them. It discussed six of them. Correct? I believe that's right, Your Honor. Okay. And if you go down those one by one, aren't there genuine issues of material fact raised on each one of those six points? Absolutely not, Your Honor. And let me . . . Take five and six. Take point five and six. Okay. Okay. There is not a genuine issue, Your Honor, because it's not enough for her to simply say, I didn't increase friction or people liked me. You have to look at the whole record. And in those items, we have evidence from each of his Hawk's subordinates that talks about them having problems with her and not wishing her to stay because of her not carrying the fair share of the workload. At Joint Appendix 109, Bonifant makes a statement about her not carrying her fair share of the workload. Joint Appendix 176, Robacker challenges her work ethic. Joint Appendix 112, Diaz challenges . . . It's all a material issue of fact. She's got her evaluation report. And a jury then is going to hear her side and your side and decide. But accepting what she says, aren't there issues of fact in what you were saying is pretext that she thinks didn't exist at all? No, Your Honor, because first, we don't think that any of this is a genuine issue. He has several independent bases, legitimate reasons that he didn't extend her. One of those things was what other people said to him about her. First of all, we would say it's not genuine. But secondly, I would return to this reasoning in the Hood case, which basically talks about the employer's perception. They have to cast doubt on the perception. He never said . . . On working relationships, she significantly exceeds requirements. That's in 2005-2006. That seems to me that it's not her words. It's your client's own words that she's positing, which makes a genuine issue of material fact. Well, Your Honor, I'd respectfully disagree. I think that the comments alone don't raise a genuine issue of material fact. You have to look at them with the ratings and with what people were actually saying. The employer, the supervisor, almost everything he said in the memo was corroborated by somebody. He didn't know that that was going to happen. I don't think there even has to be a weighing. But contradicted by his own words. Maybe corroborated by somebody, but contradicted by his own prior words, which all we're saying, doesn't that make a genuine issue of material fact? I don't think so, Your Honor. I think if you look at the cases, he's backed up his reasons. If you also look at the Green case we cited in our brief, he's documented to her . . . Let me take a stab at it. Hypothetical. In 2005, I'm the greatest thing the DA has ever seen. In 2007, they want to find me. The question that's being put to you is, that scenario, with that dichotomy, does that create a genuine dispute as to material fact? That's the question. I think you would have to look at, Your Honor, what happened, what kind of incidents happened in the interim. And some of her mistakes did happen in 2007. She had a very heated exchange over email in 2006 with her supervisor, too. But we are not saying that she was the greatest employee in 2005. She got the lowest rating you can get without being on a performance improvement plan. She got an acceptable, which is a C or a D, in 2005. He wrote these generous comments that she got along with people. She had a circle of cohesive confidants in the office. She had friends in the office. Two of them were Schwartz and Francis. She basically tried to blame the other female employee in the office, Francis, for a mistake that they made. At that point, they weren't friends anymore. It's a situation that changed. You had so many people come forward and say they had a problem with her throughout the course of discovery. I see that my time is up. May I be allowed to conclude? I just want to bring up one quick thing on the gun claim. I think the court understands the silliness of it. You have a firearm. You don't have a shotgun. In addition, it wasn't even mentioned in her charge of discrimination. So one could argue that to say she's threatened by it, it hasn't even been properly exhausted. We didn't have an opportunity to even question her on it because it came up in the opposition after the conclusion of discovery. So this was an argument that the 11th hour before we could discover anything about it. I ask that the court affirm. Thank you. Even though it was in response to Judge Greenway's question, we gave you considerable time already. Yes, Your Honor, and I will be brief. To address a question raised by Judge Roth, and I think it's best answered by a Seventh Circuit decision, Minor, M-I-N-O-R V. Centocar, C-E-N-T-O-C-O-R, 457 F. 3rd, 632. It's the Seventh Circuit from 2006. A post Burlington Northern decision where the court explained that a plaintiff does not have to establish an adverse employment action. It must only establish that the action taken against her was material, and they talk about the fact that hundreds of cases say there has to be an adverse employment action, but it doesn't appear in the statute, and it doesn't appear in a Supreme Court case. In your situation, let us say that the DEA office decided we're going to have birthday parties for men, but not for women. Adverse employment action? Probably not. For the men or for the women? Probably, yes. But the men would have a claim. But it would be discrimination, and it would be actionable. As the Seventh Circuit said in Minor, adverse employment action has become a proxy because in a lot of situations that helps prove discrimination. But if you've got discrimination, even if it's not an adverse employment action, it is still actionable under Title VII. Is there any other circuit similarly ruled? I haven't seen another circuit where it's addressed that, but I would submit that no... I'm sorry, you've seen no other circuit that's addressed adverse employment action? No, no, that has specifically addressed the point being made by the Seventh Circuit in Minor that it's not required in every case. I submit that no circuit in the example I gave would say this is not actionable discrimination. We have pointed out in our reply brief the disputed facts about the, or actually in our principle brief, the disputed facts about the transfer of the prisoner. He was in U.S. Marshals Service custody the entire time. She was along as the second person required during a flight by government policy. It was not her duty to deliver the prisoner to the grand jury. That's a disputed fact. It's in her affidavit. They dispute it. The jury has to decide that. The issue about what if she was good in 2005 versus 2007, we have evaluations from December of 2006 that are directly contradicted by the memo in March of 2007, and we don't have, for example, the claim about TFO France occurring in that two-month period. Hawke says in his memo this was over the two-and-a-half years. He's not talking about a change between when he last evaluated her and March of 2007. He is talking about a two-and-a-half year process, and we have shown why there are numerous questions of fact on that. I ask that you reverse the judgment of the district court and remand, after reinstating counts one and three of the complaint. Thank you, Your Honors. We thank both counsel for cases very well argued, and we'll take this matter under advisement. Thank you.